IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

TIMOTHY C. HARRIS,

        Plaintiff,

    v.                             No. 18-4124-SAC

CITY OF TOPEKA, KANSAS,
and CHRISTOPHER JANES,

        Defendants.

MEMORANDUM AND ORDER

        The case comes before the court on the defendant Christopher Janes's motion for summary judgment (ECF# 17) on this 42 U.S.C. § 1983 action brought by the plaintiff Timothy C. Harris. Harris alleges Janes as a City of Topeka police officer used excessive force in arresting him. ECF# 17. The defendant Janes argues he is entitled to qualified immunity because the force he used during the arrest did not violate the plaintiff's constitutional rights. ECF# 18, pp. 1-2. For all the reasons discussed below, the court denies the defendant Janes's motion.

**Summary Judgment Standard**

        Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute [about] any material fact" exists and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A disputed issue of fact is "genuine" when "the evidence is such that a

1

reasonable jury could return a verdict for the non-moving party" on that issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A disputed issue concerns a material fact "if under the substantive law it is essential to the proper disposition of the claim or defense." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotation marks and citations omitted). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-48.

The following account is taken from the record and from the parties' uncontroverted facts as viewed in the light most favorable to the non-moving plaintiff and with inferences drawn in his favor too. *See Tolan v. Cotton*, 572 U.S. 650, 655-56 (2014). Put another way, the "disputed facts must be resolved in favor of the party resisting summary judgment." *McCoy v. Meyers*, 887 F.3d 1034, 1044 (10th Cir. 2018) (internal quotation marks and citation omitted). "In qualified immunity cases, this usually means adopting . . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007). This does not mean the court may "ignore clear, contrary video evidence in the record depicting the events as they occurred." *Carabajal v. City of Cheyenne, Wyoming*, 847 F.3d 1203, 1207 (10th Cir.) (citing *Scott*, 550 U.S. at 380, and quoting, "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that

no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."), *cert. denied*, 138 S.Ct. 211 (2017). Thus, a court may rely on video evidence of record but must be "mindful" when the video evidence does "not capture all that occurred." *Id.* at 1207. It should not be overlooked that the court continues to view the evidence in the light most favorable to the plaintiff. *Thomas v. Durastanti*, 607 F.3d 655, 659 (10th Cir. 2010).

Both sides have overreached in objecting to the other side's affidavits as being conclusory and self-serving. The general rule is that information within affidavits must have a "certain indicia of reliability" and be more than allegations based on "'mere speculation, conjecture, or surmise.'" *Ellis v. J.R.'s Country Stores, Inc.*, 779 F.3d 1184, 1201 (10th Cir. 2015) (quoting *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004)). Thus, affidavits are to be "'based on personal knowledge and [must set] forth facts that would be admissible in evidence" otherwise they will be subject to an objection for being "'conclusory and self-serving affidavits.'" *Id.* (quoting *Garrett v. Hewlett–Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002)); *see API Americas Inc. v. Miller*, 380 F. Supp. 3d 1171, 1150 (D. Kan. Apr. 5, 2019). The parties' objections for conclusory and self-serving will be decided on whether the facts are based on reliable and admissible statements of personal knowledge.

**Statement of Facts**

The following comes from applying the above procedural rules governing summary judgment and from viewing the record in the light most favorable to the plaintiff. On the afternoon of January 23, 2018, Topeka Police Officer Christopher Janes answered a call and spoke with Katie Adkins who reported that Timothy Harris wrongfully possessed her laptop computer and a Victoria secret bag. Ms. Adkins's father also spoke with Officer Janes telling him that Harris drove away in a blue Chevrolet Cobalt. Officer Janes next ran a warrant check on Harris finding a "probation violation warrant" from underlying 2017 misdemeanor convictions which included unlawful interference with a law enforcement officer. Officer Janes looked at a photograph of Harris so that he could identify Harris later.

That evening at 7:13 p.m., Officer Janes saw a blue Chevrolet Cobalt with two occupants. The car was parked and facing the wrong way in 2600 block of SE 10th Street. Officer Janes drove up behind the Cobalt, shined a light on it, and activated his emergency lights. From the photo review, Officer Janes recognized the person in the driver's seat as Mr. Harris. Officer Janes called dispatch reporting a car stop and requesting a backup unit. Before Officer Janes reached the car on foot, Mr. Harris opened the car door and stepped outside of the vehicle. Officer Janes found Mr. Harris's behavior to be unusual for a car stop and ordered him back inside the car. Mr. Harris complied by sitting down in the car's seat, but he kept the door open with his left foot outside the car.

When he reached the car, Officer Janes indicated the stop was related to the car being illegally parked and asked for identification. Harris removed his driver's license from his wallet and handed it over. Officer Janes looked at the license and asked Harris why his girlfriend keeps calling the police and saying he has her "stuff." Harris said her Victoria Secrets bag with clothes was inside, but that this was all he had of her stuff. Officer Janes followed up that the girlfriend said Harris also had her computer and that his possession of it would be felony theft. Harris replied, "like I'm telling you that's what I have in my house" and they can come by and get it. Harris then observed, "so you know who I am," and the officer replied, "yes." Harris then asked if that is why he was stopped. Janes replied "yes" and because of the illegal parking. At this point, Harris began arguing that he was not parked there because the car's engine was running, and his passenger, later identified as Airel Gatewood, also began arguing this point with the officer.

The video captures Officer Janes radioing dispatch to request he "stay on channel one," because "they're a little signal 2, and I'll have a 29 for you." Signal 2 means the subject is not cooperating. Harris asked Janes, "so what's going on," and Janes replied that, "he was being detained." While Janes radioed dispatch with Harris's information for a warrant check, Harris dropped his lit cigarette on the ground and took off his jacket. The air temperature at that time was 30 degrees Fahrenheit. Janes explained in his

report that he considered Harris's throwing away a lit cigarette and taking off his jacket to be "abnormal" conduct and possibly an effort to free oneself for moving "more effectively." Harris said his conduct was taken in response to being told of his arrest, as he knew he could not take his jacket or cigarette with him.

Janes asked Harris why he was "taking his stuff off." Harris did not reply but grabbed his wallet. Janes told Harris to keep his hands from his pockets. Harris then extended his hand with the wallet toward Janes. Janes asked, "why are you handing me your stuff." At this point, Harris stands up from the car seat while saying, "I'm being detained right." The video shows Janes's gloved hand on Harris's chest to stop him from moving closer while Janes tells Harris to "have a seat." Harris did not comply by sitting back down. Janes began using both hands on Harris who is heard to say, "whoa, what are you doing?" Officer Janes immediately requested "run 10-39" which means the units should run in emergency mode with lights and sirens. According to Janes, Harris had tensed his body requiring Janes to become more physical after Harris refused to sit back down. Harris does not expressly deny tensing his body, but he does aver that he "did not resist or attempt to flee." ECF# 26-2, ¶ 12. As of that date, Harris was 34-years old with a height of six feet and one inch and a weight of 180 pounds, while Janes's height was five feet and eight inches.

The video captures Officer Janes stepping back from Harris and twice instructing him to put his hands behind his back. As Harris started to turn around, Janes finished turning him, and says, "I didn't ask you to get out of the car." Harris replied that he was "getting out of the car because," and while he spoke Harris tried to turn around. Janes restrained Harris from turning around while instructing him "do not move for me" and "bring back your arms for me." Harris replied twice, "calm down" but continued trying to turn toward Janes whenever he spoke. Janes kept instructing Harris to face away during the handcuffing while Harris keeps saying, "jeez," "calm down," and, "Jesus Christ, you really, really, really." When the handcuffing was completed, then Harris spun around and looking at Janes said, "Thank you, are you happy now?" Janes then spins Harris around to face away toward the car. Notwithstanding the plaintiff's averment that, "[a]t all times, I was cooperative and willing to be taken into custody as quickly and smoothly as possible," the above statements are established by the video recording.

The video shows Harris trying to turn around as he is up against the car. He then says, "what are you doing?" Janes replies, "I'm trying to take you to my car." Harris then turns around the other way and says, "No you're not, I'm walking with you." The passenger Gatewood gets out of the car and looking at them shouts, "James" to Harris. The video does not show what then happens but the audio portion indicates a struggle. The video resumes with an image of the sidewalk which is consistent with Janes's

takedown of Harris. During this segment of the recording, Gatewood is shouting loudly, "no you need to chill," while Harris is shouting, "what are you doing." Gatewood continues shouting, "Jim, stop," and is then seen on the video near Janes and Harris. She is shouting at the officer that he cannot do this. Janes instructs the passenger "to step back" and "I need you to step back please." Gatewood responds three times demanding that the officer, "ask me nicely" and continues to step toward Janes while shouting. Janes tells the passenger to step back and lifts his arm warning her that she's about to be pepper sprayed. The passenger steps back while continuing to berate the officer with comments and questions asking if the officer's "body cam was on." The officer kept warning her to stop.

The recording of the following events is only audio with no video confirmation. Officer Janes is heard telling Harris to stop trying to get up. Harris replies, "okay," but Janes again instructs Harris to stay on his stomach. The passenger Gatewood then demands that the officer get off Harris, and Janes again orders the passenger to back away. Janes tells Harris to get his legs out and to stop trying to get up. Janes shouts, "do not try and get up," and Harris replies, "I'm not." Janes shouts two more times to stop trying to get up. Gatewood again tells the officer to get off Harris' back. Janes repeatedly instructs Harris to stop trying to get up and even asks, "dude what is your deal." Harris answered, "I'm not trying to get up, you're laying on me." Officer Janes is then heard saying to Harris, "do not do

that," and the passenger Gatewood is heard saying, "why are you punching him." Janes shouts at Gatewood who repeats her question, "why are you punching him."

There are more struggling sounds with officer Janes shouting, "stop" and "stop trying to get up." Harris replies, "get off of me" and "stop punching me." Sirens are heard, and Gatewood says she can't wait for the other officers to get here. Harris says for the first time, "that he can't breathe." Janes responds that he can. Gatewood starts screaming repeatedly, that Harris "can't breathe and get off of him." Harris begins pleading with the officer that he can't breathe and to get off, "please," and Janes again tells Harris that he can breathe. More struggling sounds are heard, and Janes repeats the order to "stay there." Harris begins saying that he's "just trying to breathe, sir. Please sir, I don't want no trouble." There are still more struggling sounds, and again Janes says, "stop," and Harris says he "can't breathe." Gatewood yells at Janes to get off the top of Harris, and Janes says he's not on top. At which point, there are more struggling sounds and Janes shouts, "stop," and "stop trying to get up." Harris says, "I don't want to die" and "I can't breathe." Officer Janes repeats the order to "stop trying to get up" and says, "it's the pepper spray." The other officers arrive on the scene.

The video does confirm that during the apparent struggle on the ground the plaintiff's body position moved 180 degrees. It also shows the

side of Harris's face is cut and bleeding, and there is blood on the street. The video captures the plaintiff's failure to obey the officer's order to sit back down in the car and his physical resistance to the officer's effort to have him get back in the car. The video also confirms that Janes had to repeatedly order the plaintiff to turn around and to remain facing away for the handcuffing. The video likewise shows after the handcuffing Harris spun around and said to Janes's face, "Thank you, are you happy now."

From this point forward, the video is less than clear about what happened. The audio certainly indicates a struggle and more resistance, but without a video confirmation, the court must accept the plaintiff's version following the handcuffing because it is not "blatantly contradicted" by the video recording. *Scott v. Harris*, 550 U.S. 372, 380 (2007). The plaintiff avers:

> 14. After I was in handcuffs, I asked Officer Janes "what are you doing" because I could not figure out where he was trying to take me or why he was using excessive force when I was being cooperative and compliant. He said he was trying to take me to his car while he was shoving me against my car; his actions were inconsistent with what he was saying. When he said he was trying to take me to his car, I said "no, you're not. I'm walking with you."
> 15. Officer Janes then shoved me, reached across my face, and grabbed my neck. Janes then drove me face down to the curb and street. With my hands cuffed behind my back, I had no way to break my fall. I landed face-first on the curb.

ECF# 26-2. Concerning the struggle that ensued after the takedown, the plaintiff avers:

> 16. At no time did I grab at Officer Janes' belt or make any attempt to grab at any of his weapons.

17. When on the ground, Officer Janes put his knee in the center of my back. At some point, he punched me in the face several times, and sprayed me with pepper spray.
18. Before I was pepper sprayed, I told Officer Janes several times that I couldn't breathe because of the weight of him on my back and the injuries from slamming my face into the curb and street. . . .
19. While on the ground, I was not trying to escape or evade arrest. I did not grab at Officer Janes' belt or weapons. I did not elbow him in the torso or anywhere else.

ECF# 26-2. The summary judgment record on Harris's plea of "no contest" to "Interference with Law Enforcement—Process Service" does not necessarily create an irreconcilable conflict with Harris's affidavit regarding his cooperation after he was handcuffed.

The plaintiff was charged with disobeying lawful orders, obstruction, battery on a law enforcement officer and parking facing traffic. Harris pleaded no contest to unlawful parking and interference with law enforcement, and the other charges were dismissed. The plaintiff submits records from Shawnee County Correctional Facility showing he received medical care and treatment at Stormont Vail hospital. The plaintiff alleges he had surgery for a fractured jaw sustained during this arrest.

**Qualified Immunity Standard**

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(internal quotation marks omitted). The Tenth Circuit recently summarized

the analysis guiding this defense on summary judgment:

> "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan*, 134 S.Ct. at 1865. "The first asks whether the facts, 'taken in the light most favorable to the party asserting the injury, ... show the officer's conduct violated a federal right.'" *Id.* (brackets omitted) (quoting *Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001)). "The second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation." *Id.* at 1866 (quotations omitted). "It is clearly established that specific conduct violates a constitutional right when Tenth Circuit or Supreme Court precedent would make it clear to every reasonable officer that such conduct is prohibited." *Perea v. Baca*, 817 F.3d 1198, 1204 (10th Cir. 2016). Clearly established law "must be particularized to the facts of the case." *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 552, 196 L.Ed.2d 463 (2017) (quotations omitted); see also *D.C. v. Wesby*, ––– U.S. ––––, 138 S.Ct. 577, 590, 199 L.Ed.2d 453 (2018) ("The clearly established standard . . . requires a high degree of specificity." (quotations omitted)). "Of course, general statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent." *White*, 137 S.Ct. at 552 (citations and quotations omitted); see also *Wesby*, 138 S.Ct. at 590 ("[T]here can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." (quotations omitted)).
>
> "Courts have discretion to decide the order in which to engage the[ ] two [qualified immunity] prongs." *Tolan*, 134 S.Ct. at 1866 (quoting *Pearson v. Callahan*, 555 U.S. 223, 236, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan*, 134 S.Ct. at 1866.

*McCoy v. Meyers*, 887 F.3d 1034, 1044–45 (10th Cir. 2018). In short, the

defendant's assertion of qualified immunity creates a presumption that the

plaintiff must overcome by showing that, "(1) the officers' alleged conduct

violated a constitutional right, and (2) it was clearly established at the time

of the violation, such that 'every reasonable official would understood that such conduct constituted a violation of that right." *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016) (citation omitted).

**Fourth Amendment and Excessive Force**

Among Fourth Amendment protections is [t]he right of the people to be secure in their persons … against unreasonable … seizures." U.S. Const. amend. IV. The allegation of excessive force used during an arrest falls under the "Fourth Amendment right against unreasonable seizures." *Tolan*, 134 S.Ct. at 1865 (citing *Graham v. Connor*, 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)). The court's analysis "proceeds by (1) identifying the applicable unreasonableness test in the excessive force context, the *Graham* balancing test, and (2) providing an overview of relevant Tenth Circuit cases applying the *Graham* test." *McCoy v. Meyers*, 887 F.3d at 1045.

<u>*Graham* Reasonableness Balancing Test</u>

"Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Graham v. Connor*, 490 U.S. at 396 (internal quotation marks omitted). To apply properly this reasonableness test "requires careful attention to the facts and circumstances of each particular case, including

[1] the severity of the crime at issue, [2] whether the suspect poses an immediate threat to the safety of the officers or others, and [3] whether he is actively resisting arrest or attempting to evade arrest by flight." *Id*. The consideration of these factors and other relevant factors is guided by, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id*. The inquiry "is an objective one: the question is whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id*. at 397 (internal quotation marks omitted). "In other words, '[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.'" *McCoy*, 887 F.3d at 1045 (quoting *Graham*, 490 U.S. at 397)). Further, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

   The plaintiff's complaint alleges excessive force was used after he was handcuffed when Janes took him down face-first against the curb, placed a knee in his back, punched him in the face, and sprayed him with

pepper spray. In applying the *Graham* factors to these four alleged acts of excessive force, the court considers the totality of the circumstances from a reasonable officer's perspective and determines if the officer's actions were objectively reasonable. *Perea*, 817 F.3d at 1202. "An assessment of the degree of force actually used is critical to the question of whether the force was excessive." *Id.* (internal quotation marks and citations omitted). This assessment is made mindful of these points:

> *Graham* recognized that officers have the right to use some degree of physical coercion to effect an arrest. 490 U.S. at 396, 109 S.Ct. 1865. But "[t]he degree of physical coercion that law enforcement officers may use is not unlimited." *Cortez v. McCauley*, 478 F.3d 1108, 1125 (10th Cir. 2007) (en banc). "[T]he excessive force inquiry evaluates the force used in a given arrest or detention against the force reasonably necessary to effect a lawful arrest or detention under the circumstances of the case." *Id.* at 1126. We also must keep in mind, however, that "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham*, 490 U.S. at 396, 109 S.Ct. 1865 (citation and internal quotation marks omitted).

*Serrano v. United States*, 766 Fed. Appx. 561, 568 (10th Cir. 2019).

The court's analysis of the qualified immunity question is guided by the Tenth Circuit's published decision of *McCoy v. Meyers*, 887 F.3d 1034 (10th Cir. 2018), and the three published decisions discussed therein, all of which discuss the use of force after the suspect/detainee is handcuffed on the scene. The plaintiff in *McCoy* alleged that among the acts of excessive force used after he was handcuffed and zip-tied were the officers reviving him from unconsciousness, beating him multiple times, and placing him into a second carotid restraint that again rendered him unconscious. Before

analyzing the *Graham* factors, the panel summarized three precedent, all of

which also share some factual similarity to the case pending here:

> Our qualified immunity analysis relies heavily on three Tenth Circuit decisions published before the events at issue in this appeal: *Dixon v. Richer*, 922 F.2d 1456 (10th Cir. 1991); *Casey v. City of Federal Heights*, 509 F.3d 1278 (10th Cir. 2007); and *Weigel v. Broad*, 544 F.3d 1143 (10th Cir. 2008). We summarize these cases, each of which involved excessive force allegations against law enforcement officers under § 1983. In each case, this court applied the *Graham* test and held that the plaintiff had shown sufficient facts to make out a Fourth Amendment violation.
>
> a. *Dixon v. Richer*
>
> In *Dixon*, the plaintiff alleged that the police officer defendants had used excessive force by kicking, beating, and choking him in the course of an investigative stop. 922 F.2d at 1458–59. The defendants had stopped the plaintiff in his van to ask about another individual suspected of a misdemeanor. *Id.* at 1462. The plaintiff had been seen with the individual but was not himself suspected of any crime. *Id.* When stopped, the plaintiff initially submitted to a frisk by putting his hands up against his van. *Id.* at 1458. But when one of the defendants kicked him during the frisk, the plaintiff turned toward them and asked, "Is that f---ing necessary?" *Id.* The defendants called for backup and told the plaintiff to put his hands back up against the van. *Id.* The defendants began to pat the plaintiff down again and suddenly kicked him without warning. *Id.* The plaintiff began to fall, and the defendants then hit him in the stomach with a metal flashlight. *Id.* Once the plaintiff was on the ground, the defendants got on top of him and beat and choked him. *Id.* After another officer arrived on the scene, the defendants handcuffed the plaintiff. *Id.* at 1458–59.
>
> Applying the *Graham* test to these facts, we held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment. *Id.* at 1463. In doing so, we analyzed each alleged act of excessive force separately. *See id.* at 1462–63. Regarding the first kick, we determined—even though the plaintiff "w[as] not suspected of committing any crime" and "did not resist being frisked"—that the defendants acted reasonably "in an uncertain, and potentially dangerous circumstance." *Id.* at 1462. We deferred to the defendants' judgment that such force may have been necessary to effect the frisk. *Id.* But we determined that the defendants' continued use of force after the plaintiff "had already been frisked, had his hands up against the van with his back to the officers, and was not making any aggressive moves or threats" was unreasonable. *Id.* at 1463. We

reached this conclusion even though the plaintiff's "response to being kicked the first time (turning around and swearing at [the defendants]) could reasonably have been interpreted as an act of resistance." *Id.* at 1462.

b. *Casey v. City of Federal Heights*

In *Casey*, the plaintiff alleged that the police officer defendants had used excessive force by tackling, tasering, and beating him without warning in the course of arresting him for a misdemeanor. 509 F.3d at 1278. The plaintiff had exited the municipal courthouse to retrieve money from his truck to pay a traffic citation fine. *Id.* at 1279–80. Unaware that removing a public record from the courthouse constituted a misdemeanor under state law, the plaintiff had left the building still holding his court file. *Id.* The defendants stopped the plaintiff without explanation as he was returning to the courthouse. *Id.* The plaintiff stated that he needed to get back to the courthouse to return the file. *Id.* Without explaining that he was under arrest, the defendants tackled him to the ground. *Id.* They then tasered and handcuffed him and beat his head against the ground. *Id.*

Applying the *Graham* test to these facts, we held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment. *Id.* at 1283, 1286. We determined that "all three [*Graham*] factors suggest[ed] that the officers used excessive force." *Id.* at 1281. First, we noted that the plaintiff "had committed a misdemeanor in a particularly harmless manner, which reduces the level of force that was reasonable for [the defendant] to use." *Id.* Second, we noted that the defendants had no reason to believe that the plaintiff posed an immediate threat to anyone's safety because he "was not violent during the encounter." *Id.* at 1282. Third, we noted that the plaintiff "was not attempting to flee … but rather return to the … courthouse," which "[i]f anything, … would have made himself easier to capture, not harder." *Id.*

c. *Weigel v. Broad*

In *Weigel*, Bruce Weigel's estate brought suit after Mr. Weigel died in an altercation with the highway patrol officer defendants. 544 F.3d at 1146–47. The estate alleged that the defendants had used excessive force by putting pressure on Mr. Weigel's upper torso for several minutes. *Id.* at 1152. This occurred after Mr. Weigel had collided into the defendants' police car on the highway. *Id.* at 1147. The defendants suspected Mr. Weigel of driving while inebriated. *Id.* at 1147–48. He agreed to submit to a sobriety test but then walked out in front of oncoming traffic and continued crossing the highway even after getting struck by a passing van's sideview mirror. *Id.* at 1148. The defendants followed, tackled him to the ground, and put him in a "choke hold." *Id.* During this struggle, Mr. Weigel fought back

"vigorously, attempting repeatedly to take the [defendants'] weapons and evade handcuffing." *Id.* The defendants managed to handcuff Mr. Weigel, but he continued to struggle, so a bystander assisted by lying across the back of his legs. *Id.* The defendants then maintained Mr. Weigel in a facedown position and applied pressure to his upper torso. *Id.* Another bystander found plastic tubing or cord and bound Mr. Weigel's feet. *Id.* The defendants continued to apply pressure to Mr. Weigel's upper torso for several minutes until it was determined that Mr. Weigel had gone into cardiac arrest. *Id.* at 1149, 1152–53.

Applying the *Graham* test to these facts, we held that the plaintiff had sufficiently shown a Fourth Amendment violation to survive summary judgment. *Id.* at 1152–53. We determined that the defendants' use of force after—but not before—Mr. Weigel's hands and feet were bound was unreasonable. *See id.* (holding that the defendants' use of force, at least once Mr. Weigel "was handcuffed and his legs were bound," was unreasonable in part because they knew it "was unnecessary to restrain him"); *id.* at 1155 (Hartz, J., concurring) ("I do not think that the defendants violated Mr. Weigel's constitutional rights before his legs were bound[,] [i]n light of Mr. Weigel's strength and previous behavior."). We offered two reasons in support of our conclusion. First, the defendants' training materials would have put a reasonable officer on notice that "the pressure placed on Mr. Weigel's upper back as he lay on his stomach created a significant risk of asphyxiation and death." *Id.* at 1152. Second, any threat posed by Mr. Weigel had passed "once Mr. Weigel was handcuffed and his legs were bound," as evidenced by the fact that one of the defendants then returned to the police vehicle and called the dispatcher reporting that Mr. Weigel was under control. *Id.* at 1152–53.

*McCoy v. Meyers*, 887 F.3d at 1045–47 (footnotes omitted). In applying the *Graham* factors, the panel in *McCoy* noted that the severity of the suspected crime and the reasonable suspicion of a firearm being pointed at an officer weighed against the plaintiff. The panel noted that completed crimes could be considered in weighing the first factor. The panel, however, found that the second factor favored McCoy because he was handcuffed and zip-tied and that a reasonable jury could find that the officers "should have been

able to recognize and react to the changed circumstances." 887 F.3d at

1050. The court noted:

> [T]he relevant inquiry is not how much time elapsed but whether that amount of time provided a meaningful opportunity for a reasonable officer to recognize and react to changed circumstances. *See Waterman v. Batton*, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified *even seconds later* if the justification for the initial force has been eliminated." (emphasis added)).

887 F.3d at 1050 n.19. The court also found that the third factor of active

resistance favored McCoy observing:

> Our cases have consistently concluded that a suspect's initial resistance does not justify the continuation of force once the resistance ceases. *See Perea*, 817 F.3d at 1203 ("Although use of some force against a resisting arrestee may be justified, continued and increased use of force against a subdued detainee is not."); *see also Weigel*, 544 F.3d at 1152–53 (a reasonable jury could find that the alleged force was excessive once the plaintiff's hands and feet were bound, even though the plaintiff had previously put up significant resistance); *Dixon*, 922 F.2d at 1462–63 (a reasonable jury could find that the alleged force was excessive once the plaintiff had been frisked, had his hands against a vehicle, and was no longer making aggressive moves, even though the defendants could reasonably have perceived the plaintiff's previous actions as resistance); *Herrera v. Bernalillo Cty. Bd. of Cty. Comm'rs*, 361 Fed.Appx. 924, 928 (10th Cir. 2010) (unpublished) (a reasonable jury could find that the alleged force was excessive where the defendants "acknowledge[d] that, whatever apprehensions of possible flight might have existed when they first saw [the plaintiff], by the time [of the alleged force] further flight was no more than 'certainly possible' and was 'perhaps unlikely'" (citation omitted)).

887 F.3d at 1051.

The court also has reviewed the Tenth Circuit's recent

unpublished decision in *Osterhout v. Morgan*, 763 Fed. Appx. 757 (10th Cir.

Feb. 19, 2019). After a car chase in which Osterhout did not realize he was

being pursued by a law enforcement vehicle, Osterhout pulled over his motorcycle upon seeing the law enforcement markings on the car chasing him. The sheriff's car pulled up hitting the motorcycle and throwing Osterhout into the ditch. Osterhout did not resist or attempt to flee and stood up with his hands in the air. Officer Morgan approached Osterhout hitting him in the face with such force that it knocked him to the ground and broke his nose. While he was on the ground, the officer handcuffed Osterhout and then kneed him several times in the ribs. The first two factors favored a finding of unreasonable force, and on the third factor, the panel found:

> We are not persuaded. Even if Mr. Osterhout's operation of the motorcycle had previously posed a threat to the officers or members of the public, the circumstances had changed. The high-speed chase had ended, Mr. Osterhout was no longer on his motorcycle and, viewing the evidence in the light most favorable to him, he was standing still, facing the patrol car with his arms raised when Officer Morgan approached him. A reasonable jury could conclude based on this evidence that Officer Morgan "should have been able to recognize and react to the changed circumstances," *McCoy*, 887 F.3d at 1050 (internal quotation marks omitted), and further conclude that under these circumstances, a reasonable officer would not have believed that Mr. Osterhout posed an immediate threat to the officers or the public. Accordingly, the final *Graham* factor also weighs in favor of finding under *Graham*'s reasonableness test that Officer Morgan used excessive force in striking Mr. Osterhout in the face without warning. Viewing the evidence in the light most favorable to Mr. Osterhout, therefore, a reasonable jury could conclude that this force violated Mr. Osterhout's Fourth Amendment rights.

*Osterhout v. Morgan*, 763 Fed. Appx. at 762.

The first factor, the severity of Harris's crime, weighs against using any more force than necessary to detain him on the outstanding

probation violation warrant on non-serious offenses. Janes concedes the severity of the crime "is on the low end." ECF# 29, pp. 29-30. This factor does not favor tackling, punching, or applying pepper spray absent other circumstances like Harris actively resisting or evading arrest. On the summary judgment record, the second factor of immediate threat to officer safety also does not favor finding Janes's use of force to be objectively reasonable. There were several circumstances that may have initially supported this concern when Harris got out of the car, refused to sit back down, and kept turning around during the handcuffing. But when Harris was fully handcuffed behind his back and announced he would be cooperating by walking with Janes to the patrol car, circumstances appear to have changed. The recording does not contradict Harris's affidavit that he was not physically resisting being arrested and taken to the patrol car at that point. A reasonable jury could conclude that Janes "should have been able to recognize and react to the changed circumstances." *McCoy*, 887 F.3d at 1050 (internal quotation marks and citation omitted). The dissipation of an immediate threat weighs against the force used in taking Harris to the ground and putting a knee in his back. As for the struggling on the ground, Harris denies reaching for Janes's belt or weapons, and nothing in the recording directly contradicts this averment. Thus, the lack of immediate threat weighs against the increased use of force—punching and pepper spray. Accordingly, the final *Graham* factor of active resistance or attempts

to flee also weighs in favor of finding excessive force in tackling the handcuffed Harris who may have been passively resisting, "are you happy now," but he was no longer actively resisting and appeared to be cooperating in accompanying Janes to the patrol car. As far as the struggle on the ground and the increased use of force, the video does not confirm what happened such that it directly contradicts Harris' affidavit regarding his cooperation. The cessation of resistance following Harris's handcuffing and his announcement that he was cooperating in going to the patrol car weigh in favor of finding the officer's force after this point was unreasonable. The court is satisfied that Harris has come forward with sufficient facts to make out a Fourth Amendment violation based on Janes's use of force following the handcuffing in taking down Harris, putting a knee in his back, punching him, and using pepper spray. The dangers that had existed before handcuffing and apparent cooperation do not justify this later use of increasing force. *McCoy*, 887 F.3d at 1052 ("*See Cavanaugh v. Woods Cross City*, 625 F.3d 661, 666 (10th Cir. 2010) (concluding that while 'our role is not to second guess on-the-ground decisions with the benefit of 20/20 hindsight[,] . . . [i]t is not objectively reasonable to ignore specific facts as they develop (which contradict the need for [a particular] amount of force), in favor of prior general information about a suspect")."). Viewing the evidence in the light most favorable to Harris, therefore, a reasonable jury could find that this force violated his Fourth Amendment rights.

<u>Clearly Established Law</u>

Moving to the other prong of the qualified immunity analysis, the court here "asks whether the right in question was clearly established at the time of the violation." *Tolan*, 572 U.S. at 656. The Supreme Court "has repeatedly told courts . . . not to define clearly established law at a high level of generality." *Kisela v. Hughes*, 584 U.S. ---, ---, 138 S.Ct. 1148, 1152 (2018) (*per curiam*). The Supreme Court recently observed the importance of specificity in "excessive force cases":

>  "Specificity is especially important in the Fourth Amendment context, where the Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts. Use of excessive force is an area of the law in which the result depends very much on the facts of each case, and thus police officers are entitled to qualified immunity unless existing precedent squarely governs the specific facts at issue….
> "[I]t does not suffice for a court simply to state that an officer may not use unreasonable and excessive force, deny qualified immunity, and then remit the case for a trial on the question of reasonableness. An officer cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id.* [*Kisela v. Hughes*], at ––––, 138 S.Ct., at 1153 (quotation altered).

*City of Escondido, Cal. v. Emmons*, 139 S. Ct. 500, 503 (2019). The Court in *Emmons* was critical of the appellate court for its "high level of generality" in speaking of the "right to be free of excessive force" when it "should have asked whether clearly established law prohibited the officers from stopping and taking down a man in these circumstances." *Id*. The Court quoted from

its decision in *District of Columbia v. Wesby*, 583 U.S. ---. 138 S.Ct. 577, 581 (2018):

> "[W]e have stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment. . . . While there does not have to be a case directly on point, existing precedent must place the lawfulness of the particular [action] beyond debate. . . . Of course, there can be the rare obvious case, where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances. . . . But a body of relevant case law is usually necessary to clearly establish the answer. . . ."

*Emmons*, 139 S.Ct. at 504. The court finds that the question here is whether it was clearly established that an arrestee on a probation violation warrant would have a right not to be tackled to ground, kneed in the back, punched in the face, and pepper-sprayed after he was handcuffed, was cooperating with the officer's request to go to the patrol car, was not physically resisting or attempting to evade the officer, and was not attempting to reach for the officer's belt or weapons.

For the precedent cited by Janes, *Simpson v. Kansas*, 593 Fed. Appx. 790 (10th Cir. Nov. 26, 2014), and *Mecham v. Frazier*, 500 F.3d 1200 (10th Cir. 2007), he relies on the resemblances in the kind of force used during a car stop to arrest for misdemeanor offenses when the arrestee is actively resisting. Neither case, however, addressed the reasonableness of that force when the arrestee is handcuffed and has become cooperative. In *McCoy,* the Tenth Circuit looked to *Dixon*, *Casey*, and *Weigel* as the clearly established law in 2011 making "it clear to any reasonable officer in the

Appellees' position that the post-restraint force was unconstitutional." The

court added:

> *Dixon*, *Casey*, and *Weigel* clearly establish that the Fourth
> Amendment prohibits the use of force without legitimate justification,
> as when a subject poses no threat or has been subdued. *See Casey*,
> 509 F.3d at 1286 ("[A]n officer's violation of the Graham
> reasonableness test is a violation of clearly established law if there are
> no substantial grounds for a reasonable officer to conclude that there
> was a legitimate justification for acting as she did." (quotations
> omitted) ); *see also Weigel*, 544 F.3d at 1152 (the justification for
> using force ceased "once Mr. Weigel was handcuffed and his legs were
> bound"); *Dixon*, 922 F.2d at 1463 (the justification for using force
> ceased once the plaintiff "had already been frisked, had his hands up
> against the van with his back to the officers, and was not making any
> aggressive moves or threats"). In light of these cases, every
> reasonable official in the Appellees' position should have known that
> repeatedly striking a suspect—who is handcuffed, zip-tied, and just
> regaining consciousness—and subjecting him to a carotid restraint is
> unconstitutional.
>     . . . .
> In *Perea*, for example, we relied primarily on *Dixon* in holding that it
> was "clearly established [on March 21, 2011] that officers may not
> continue to use force against a suspect who is effectively subdued."
> *See* 817 F.3d at 1201, 1204–05. Likewise, *in Estate of Booker*, we
> relied on *Weigel*, *Casey*, and out-of-circuit cases in holding that it was
> clearly established on July 8, 2010 that officers may not use force—
> namely, pressure on back, tasering, and neck restraint—"on a person
> who is not resisting and who is restrained in handcuffs." See 745 F.3d
> at 412, 428–29.

887 F.3d at 1052-53 (footnote omitted).

Viewing the evidence in the light most favorable to Harris, the

court finds the Tenth Circuit precedent existing as of January of 2018-*Dixon*,

*Casey*, *Weigel*, *Perea*, and *Estate of Booker*-made it clear to any reasonable

officer in Janes's position that it was unconstitutional to take down the

arrestee face-first, to apply knee pressure to his back, to punch him in the

face, and to pepper spray him when the arrestee is restrained by handcuffs, is cooperating by walking to the patrol car, and is not resisting. The defendant Janes is not entitled to qualified immunity on summary judgment.

IT IS THEREFORE ORDERED THAT the defendant Christopher Janes's motion for summary judgment (ECF# 17) is denied.

Dated this 6th day of August, 2019, Topeka, Kansas.


s/Sam A. Crow_____
Sam A. Crow, U.S. District Senior Judge